ED KASHI,
          **Plaintiff,**

    v.

**MCGRAW-HILL GLOBAL EDUCATION
HOLDINGS AND MCGRAW-HILL
SCHOOL EDUCATION HOLDINGS,
LLC,**
          **Defendant.**

CIVIL ACTION

NO.  17-1818

## OPINION

Plaintiff Ed Kashi, a professional photographer, sued Defendants McGraw-Hill Global Education Holdings and McGraw-Hill School Education Holdings, LLC (collectively "Defendants") on one count of infringement under the Copyright Act, 17 U.S.C. §§ 501 *et seq.*, for violating copyrights he holds on various photographs.  Defendants had obtained permission to use Plaintiff's photos through licensing agreements; Plaintiff claims that Defendants exceeded the uses permitted by those agreements.  The parties each now move for summary judgment with respect to certain photographs at issue in this case.  For the reasons that follow, Defendants' motion shall be granted in part and denied in part, and Plaintiff's motion shall be denied in full.

## I. FACTS

Plaintiff is a photographer who entered into a series of agreements with stock photo company Corbis Corporation ("Corbis"), thereby granting Corbis the authority to license Plaintiff's photographs to third parties.  Pursuant to those agreements, Plaintiff was to receive a portion of the fees that Corbis collected.  Corbis then granted Defendants limited, non-exclusive licenses to publish the photographs in various textbooks.

When Defendants sought to use a photo from Corbis, they sent Corbis a request indicating the use, geographic distribution, language, and format for the photograph.  Corbis then

sent back an invoice. The principal question at issue is the meaning of the requests and the invoices.

The answer, the parties contend, lies in the agreements between Corbis and Defendants. In 2000, they signed a "letter agreement" that defined a set of fees and conditions for licensed photos, and which was revised in the years that followed by several "Preferred Pricing Agreements" ("PPAs" or "Agreements"). Those PPAs governed "future licensing by McGraw-Hill of images from the Corbis Collection" and specified prices to be paid for ranges of total uses of a photo.

Plaintiff claims that these PPAs laid out a clear framework: At Defendants' request, Corbis provided an invoice granting a license for a specific set of uses of a given photo. The price Defendants paid was governed by the terms of the PPA. Thus, in Plaintiff's view, the invoices that Corbis issued to Defendants represented the license for those specific uses, which means that when Defendants printed photos in quantities or in manners not permitted by the invoice, they exceeded the license. Defendants, on the other hand, argue that the uses listed on the request and the invoices were simply "anticipated use[s]," and therefore exceeding the limitations detailed by the invoice does not equate to exceeding the license.

The sixty-nine photos in this case can be split into three principal categories and one sub-category.[1] First, the parties now agree that for forty-five photos, there is no evidence of infringement (the "No Evidence Photos"). That leaves twenty-four photos. Nineteen of those twenty-four photos were invoiced through Corbis, forming the second category of photos (the

---

[1] These photographs are presented by Plaintiff in his First Amended Complaint on a spreadsheet, referred to here as the Chart. The Chart is broken down into two exhibits, Exhibit 1 and Exhibit 2, each of which contains several rows of photographs, the copyrights for which Defendants allegedly infringed. Each row in the Chart represents a single photograph, and includes the image itself, copyright registration information (date and number), publication information, invoice information (date, number, and licensor), and license limits.

"Corbis Photos"). A sub-category of the nineteen Corbis Photos involves eight photos for which Plaintiff seeks to elect statutory damages (the "Statutory Election Photos"). Finally, the last category consists of the five remaining photos, none of which was licensed by Corbis, but that nevertheless ended up in Defendants' textbooks (the "Miscellaneous Photos"). Defendants seek summary judgment as to all photos except the Miscellaneous Photos, and Plaintiff seeks summary judgment as to all photos except the No Evidence Photos. Plaintiffs also seek a judgment that Defendants' infringement was willful.

## II.    LEGAL STANDARD

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir. 1989). Materiality of facts is determined by reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute "exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018) (internal quotation marks omitted). "[A]ll reasonable inferences" must be drawn in the non-moving party's favor. *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

## III.    ANALYSIS

To prove copyright infringement, Plaintiff must establish "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Tanksley v. Daniels*, 902 F.3d 165, 173 (3d Cir. 2018). A valid license is a defense to a claim of copyright infringement. *See MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.,* 952 F.2d 769, 778-79 (3d Cir. 1991); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996).

## A.  Defendants' Motion for Partial Summary Judgment

### 1.  No Evidence Photos

The parties agree that Plaintiff cannot prove that Defendants copied forty-five of the works without authorization, which means Plaintiff cannot prove Defendants infringed his copyrights as to those photos.  Because both parties agree that there was no infringement, Defendants' motion shall be granted with respect to those photos.[2]

Defendants further argue two additional photos, Rows 20 and 48 of Exhibit 1, fall into the No Evidence category.  Plaintiff disagrees, asserting by motion and affidavit that Defendants have not produced any usage or license information, and therefore that summary judgment cannot be entered both because there remain disputes as to material facts and because discovery is incomplete.  Defendants, on the other hand, claim that sworn declarations from their employees indicate that Defendants were not responsible for the textbooks in question, which would therefore defeat any question of material fact as to whether they exceeded the terms of the license.

Both parties have produced some evidence in support of their respective positions: Plaintiff submits data relating to the photos and their connection to Defendants—including the invoice date and number, the entity that printed them, and that Corbis licensed them to Defendants—and Defendants submit sworn affidavits from two employees.  But it is the moving party's burden to demonstrate an absence of material fact, *Huang v. BP Amoco Corp.*, 271 F.3d

---

[2] Plaintiff expressly does not oppose entry of judgment as to the forty-four photos found in the following locations in the Chart: Rows 3, 5, 6, 7, 8, 9, 10, 13, 14, 15, 16, 19, 21, 22, 23, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 52, 53, 54, 55, 56, and 57 of Exhibit 1, and Row 9 of Exhibit 2.  As to one additional photo, Row 18 of Exhibit 1, Plaintiff had claimed Defendants exceeded their license by distributing the photo internationally.  Nevertheless, Plaintiff and Defendants now agree that Defendants had "obtained and paid invoice no. 110589 . . . which granted . . . the right to distribute the textbook containing the photo at issue throughout the world."  Given this agreement, summary judgment shall also be granted with respect to Row 18, Exhibit 1.

560, 564 (3d Cir. 2001), and Defendants' affidavits fail to meet this burden. More specifically, only a declaration from a McGraw-Hill School Education Holdings employee makes any reference at all to the photo in Row 20 of Exhibit 1 of the Chart, indicating that the employee believes that "all use of the pleaded photo fell within the explicit limits of the invoice listed in the claims chart." But both in light of Defendants' inability to produce any usage or license information about the photo and in light of Defendants' legal contention, discussed *infra*, that their license to sue the photos was essentially unlimited, this bare assertion that Defendants' use of the photo fell within permitted limits puts the rabbit in the hat. The other affidavit does not mention the Row 20 photo at all. With regard to the photo in Row 48, Defendants' employees only say that they could not identify the particular textbook in which the photo appeared or any other relevant data. In sum, whether a license existed and whether Defendants copied the photos in excess of any license remain questions on which a reasonable jury could disagree, and therefore summary judgment on these two photos shall be denied.[3]

### 2. Corbis Photos

Defendants acknowledge that they exceeded the terms of use listed in the invoices they received for use of almost all of the Corbis Photos.[4] Nevertheless, the parties dispute two key issues: (1) whether Defendants had a license to use photos in excess of the specific uses listed on the invoices; and (2) even if Defendants did exceed their license, whether that transgression sounds in copyright, as Plaintiff asserts, or in contract, as Defendants assert. These two questions will be addressed in turn.

---

[3] To the extent Plaintiff argues the Court should wait to rule on summary judgment because discovery is "incomplete," he is mistaken: Fact discovery concluded on December 22, 2017.

[4] The nineteen photos in this category are Rows 1, 2, 4, 11, 12, 17, 20, 24, 25, 32, 38, 39, and 48 of Exhibit 1 and Rows 1, 6, 8, 10, 11, and 12 of Exhibit 2 of the Chart. Defendants do dispute whether they overran invoices for the photos in Rows 20 and 48 of Exhibit 1.

*a. License Agreements*

A valid license is a defense to copyright infringement. *MacLean Assocs.*, 952 F.2d at 778-79. Determining whether Defendants had a license to print more copies of the photos than the amount listed in the invoice requires looking to the terms of the PPAs entered into by Defendants and Corbis. Although four successive PPAs were agreed upon between Corbis and Defendants, in 2003, 2006, 2009, and 2014, only the 2003 PPA and the 2009 PPA are analyzed here. The 2006 PPA does not materially differ from the 2003 PPA, and the parties have agreed that all of the photos governed by the 2014 PPA should be dismissed, *see supra* Section III.A.1.[5] Both the 2003 and the 2009 PPAs had additional agreements incorporated into their terms: The 2003 PPA incorporated a set of "Terms & Conditions" ("T&Cs"), and the 2009 PPA incorporated an End User License Agreement.[6]

Pursuant to New York law,[7] "[t]he words and phrases used by the parties [to a contract] must . . . be given their plain meaning." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014). If the agreement is "complete, clear and unambiguous on its face," then "[it] must be enforced according to the plain meaning of its terms." *Id.* Whether a contract is ambiguous is a matter of law. *See Greenfield v. Phillies Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). Ambiguity exists "when the contract, read as a whole, fails to disclose its purpose and the parties' intent . . . or when specific language is susceptible of two reasonable interpretations."

---

[5] Three Corbis Photos precede the PPAs and were governed by separate letter agreements: Rows 6, 8, and 11 of Exhibit 1 in the Chart. Defendants' motion does not address these photos. Therefore, the letter agreements will not be discussed, and summary judgment shall be denied with respect to those photos. *See FDIC v. Deglau*, 207 F.3d 153, 169 (3d Cir. 2000) (noting that failure to raise an issue constitutes waiver); *Russell v. City of Philadelphia*, 698 F. App'x 709, 710-11 (3d Cir. 2017) ("[I]t is the attorney's job (not the court's) to closely examine the record to determine if sufficient issues of fact exist to warrant a trial.").

[6] The attachment is actually entitled "Content License Agreement," but because the parties refer to it as the "End User License Agreement," the Court will use the same convention.

[7] Each PPA states: "Any dispute regarding this Agreement shall be governed by the laws of the State of New York[.]"

*Ellington*, 21 N.E.2d at 1003 (internal quotation marks omitted).  Contract construction is an objective inquiry.  *John's Insulation, Inc. v. Siska Const. Co., Inc.*, 671 F. Supp. 289, 293 (S.D.N.Y. 1987) (applying New York law).

Here, although the terms of the PPAs varied slightly over time, each unambiguously indicated that Defendants were not permitted to print more photos than the invoice stated.  The T&Cs incorporated into the 2003 Agreement specifically state that the "reproduction of Images is limited to (i) internal evaluation or comps, or (ii) the specific use described in your invoice, which together with these terms shall constitute the full license granted."  Similarly, the 2009 PPA stated that "[i]f [Defendants] desire[] to increase the total number of Unique Users after the initial license for such Image is granted, [Defendants] may re-license such Image."  The End User License Agreement of the 2009 PPA, which was incorporated into that Agreement, also specifically stated that Corbis granted Defendants "a limited, non-exclusive right to use the Rights Managed Content . . . solely as specified in the PPA, as modified by the Invoice."

Defendants, however, assert that the PPAs should be read as essentially unlimited licenses.  They base their argument on the fact that each PPA provides a price for unlimited use: The 2003 PPA includes a price for use of an image "over 250,000" times, and the 2009 PPA includes a similar term based on the number of "Unique Users."  But, contrary to Defendants' assertions, the pricing terms in the PPAs do not allow additional uses beyond those specified in each invoice.  Instead, the pricing terms in the PPAs—including those that define a price for "over 250,000" copies—simply state a price that would apply if, at some point in the future, a new invoice were issued that allowed for expanded use.[8]  The fundamental takeaway, then, is that the invoices and the pricing terms in the PPAs serve different purposes:  The invoice

---

[8] To the extent Defendants make the same arguments about the letter agreements' pricing structure being a "license," those arguments fail for the same reason.

provides for how many copies Defendants could make, and the pricing terms provide for how much those copies will cost. Thus, the pricing terms are just that—prices that obtain in all instances—and are not licenses.

Reading the pricing terms in the broader context of the full agreement solidifies this conclusion. *See Great Minds v. Fedex Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) ("Under New York law, courts must consider how the contract would be understood by a reasonably intelligent person who has examined the context of the entire integrated agreement.") (footnote and quotation marks omitted). Other provisions in the Agreements speak to exactly the contingency of invoices being expanded. For example, the 2003 PPA requires that "all rights be[] licensed." Similarly, the 2009 PPA indicates that any "distribut[ion], publi[cation], display, or . . . use" of the content beyond that "specifically permitted in the Agreement" is prohibited. In sum, each of the pricing terms in the Agreements reads as an understanding related to pricing of potential future licenses granted by Corbis to Defendants, not as an expansion of the scope of a given license.

Defendants also argue that they received an implied license to use the photos through their course of dealing with Corbis. Typically, an implied license may exist where the licensee requests the work, the licensor makes and delivers the work, and the licensor intends that the licensee distribute the work. *See Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 275 (3d Cir. 2006); *but see Psihoyos v. Pearson Educ. Inc.*, 855 F. Supp.2d 103, 119-29 (S.D.N.Y. 2012) (discussing ways that various courts have "relaxed the test"). Implied agreements, however, cannot exist where there is "an express contract that covers the same subject matter" between the parties. *Baer v. Chase*, 392 F.3d 609, 617 (3d Cir. 2004); *see also G5 Techs., Inc. v. Int'l Bus. Machines Corp.*, 2005 WL 2271741 (S.D.N.Y. Sept. 19, 2005)

(noting the same, as to New York law). Here, a license based on the parties' course of dealing cannot be implied because the parties had an express contract concerning the licenses.[9]

### b. Copyright versus Contract Claims

Not all breaches of a license are treated the same. Whereas breaches of covenants to license agreements are enforceable through a breach of contract action, breaches of conditions precedent give rise to copyright infringement claims. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939-42 (9th Cir. 2010). Defendants contend that even if they violated the terms of the invoices and the PPAs, those breaches were of covenants that sound in contract law, and therefore Plaintiff's claims must be dismissed as not actionable under the Copyright Act.

A covenant is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081 (N.Y. 1984). A condition precedent, on the other hand, is "an act or event . . . which, unless . . . excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995).

This distinction between covenant and condition matters because if a licensee fails to satisfy a condition, then "the rights dependent upon satisfaction of [the] condition have not been effectively licensed" at all. *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.15[A], at 10-121). In other words, satisfaction of the condition precedent is what triggers the contractual obligations of the parties to come into force and brings the parties' claims within the ambit of the contract rather

---

[9] Defendants also point to language in the PPAs suggesting that the terms of the PPA take priority over "conflicting" terms in the Terms and Conditions, but do not point to an actual conflict between the PPAs and the Terms and Conditions.

than within the ambit of copyright law. *See id.* If, on the other hand, the condition is not satisfied, then "the licensee is without authority from the licensor." *Id.* (quoting 3 *Nimmer on Copyright, supra*, § 10.15[A], at 10-121). As a result, no contractual obligations apply, and the copyright holder may pursue an action for infringement. *Id.*

This is why courts sometimes frame the question as asking whether a purported licensee "exceeded the scope of its license" by making copies before any contractual right to do so has come into effect, rather than directly asking whether a covenant or a condition was violated. *See, e.g.*, *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989); *Gilliam v. Am. Broadcasting Cos., Inc.*, 538 F.2d 14, 20 (2d Cir. 1976). In reality, these inquiries are two sides of the same coin. If a licensee does not satisfy a condition precedent to the licensing agreement, then by making extra copies, the licensee has gone beyond the scope of the agreement. And if a licensee has exceeded the scope of the agreement, its "position is no different from that of an infringer having no contractual relationship with the holder of the copyright," giving rise to liability under the Copyright Act. *Kanakos v. MX Trading Corp.*, 1981 WL 1377, *2 (S.D.N.Y. Sept. 16, 1981).

Under New York law, whether a condition precedent exists is a matter of law, *Powlus v. Chelsey Direct, LLC*, 2011 WL 135822, at *4 (S.D.N.Y. Jan. 10, 2011), and ambiguous terms are presumed to be covenants, not conditions, *Graham*, 144 F.3d at 237. In determining whether a condition exists, New York courts look for "the unmistakable language of condition ('if,' 'unless and until')." *Oppenheimer*, 660 N.E.2d at 418; *see also Weiss v. City of New York*, 731 N.E.2d 594, 596 (N.Y. 2000) (describing "except" as "conditional language"). However, "specific, talismanic words are not required." *Bank of N.Y. Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016). Courts applying New York law

find that expressly conditioning a license on receipt of payment creates a condition, *see, e.g.*, *Tangorre v. Mako's, Inc.*, 2003 WL 470577, at *7 (S.D.N.Y. Jan. 6, 2003); *Preferred Mortg. Brokers, Inc. v. Byfield*, 723 N.Y.S.2d 230, 231 (N.Y. App. Div. 2001), and, similarly, that where parties agree that "failure to pay [will] be viewed as copyright infringement," a condition has likely been created, *Powlius*, 2011 WL 134822, at *5 (quoting *Irwin v. Am. Interactive Media, Inc.*, 1994 WL 394979, at *4 (C.D. Cal. Apr. 14, 1994)). The chronological order of obligations is critical: Conditions "must occur *before* a duty to perform a promise in an agreement arises." *PaySys Int'l, Inc. v. Atos Se Worldline SA, Atos IT Servs. Ltd.*, 226 F. Supp.3d 206, 226 (S.D.N.Y. 2016) (applying New York law).

The language of both the 2003 PPA and the 2009 PPA, along with the invoices, create a condition in unmistakable terms; thus, by exceeding the uses authorized by the invoices, Defendants violated a condition of their license agreements with Corbis.

To start, both PPAs contain the "language of condition." *Oppenheimer*, 660 N.E.2d at 418. The Terms and Conditions ("T&Cs") attached to the 2003 PPA stated, "*unless* otherwise specified in a separate writing signed by Corbis, your reproduction of the images is limited to . . . the specific use described in your invoice," (emphasis added); the invoices, in turn, specified the quantity and uses that were licensed. The T&Cs also noted that "[a]ny license granted . . . is *conditioned upon* . . . Corbis' receipt of full payment by you for such use as invoiced by Corbis." (emphasis added). In other words, by the express terms of the agreement, there was no right to use the photos unless payment was received. *See Tangorre*, 2003 WL 470577, at *7. Similarly, the End User License Agreement attached to the 2009 PPA states that "*[e]xcept* where specifically permitted in the Agreement, [Defendants] may not distribute, publish, display or otherwise use in any way . . . the Rights Managed Content." (emphasis added). And it also

provides that "[a]ny and all licenses granted by Corbis are *conditioned upon* . . . Corbis' receipt of full payment by [Defendants] as identified in the applicable invoice." (emphasis added). Defendants fail to point to language in the Agreements that suggests that that these requirements are anything other than conditions.

"[T]he context of the entire integrated agreement," *Great Minds*, 886 F.3d at 94, further supports the conclusion that the license terms at issue are conditions, not covenants. Both PPA's underscore their "limited" nature, and that "unauthorized use . . . constitutes Copyright infringement." *See Powlius*, 2011 WL 134822, at *5. The 2003 agreement further emphasizes that "[Defendants] ability to access an Image does not in itself entitle [Defendants] to use that Image. Use of any Image contrary to a listed restriction is prohibited." And the 2009 agreement notes that "Corbis reserves all rights not specifically granted in this Agreement[.]" These provisions bolster the conditional language, leading to the conclusion that as an "objective" matter, *John's Insulation*, 671 F. Supp. at 293, the Agreements only encompass uses authorized by invoice; any use beyond what the invoices specify fall outside the scope of the license.

Defendants try to avoid this unmistakable language in three ways. First, they focus the Court's attention on the fact that the PPAs each define "various pricing levels based on the range of possible uses," and that this tiered pricing system noted what the price would be for uses beyond those covered by particular invoices. Defendants assert that these pricing schedules "show[] that any overuse was contemplated by the agreement itself." *Id.* Not so. Defendants' argument assumes that parties cannot agree to pricing in advance of actually completing a transaction, when, from the terms of the PPAs, it appears that the parties did just that. Specifying a price *if* you agree to a transaction in the future is not the same as agreeing to a transaction.

Second, Defendants point to a provision in the T&Cs included in the 2003 PPA that authorized Corbis to charge Defendants "ten . . . times the normal license fee for any unauthorized use," and suggest that "[t]his demonstrates that not only did McGraw-Hill have permission to make additional uses, it also conclusively shows that any 'overuse' was contemplated by the agreement itself." But this statement does not obviate the clear language of the Agreements, which expressly states that "[u]se of any Image contrary to a listed restriction is prohibited" and that "[e]xcept where specifically permitted in the Agreement, [Defendants] may not distribute, publish, display or otherwise use [the photos] in any way." In fact, the provision in question directly follows the unambiguous statement: "Unauthorized use of these Images constitutes copyright infringement and shall entitle Corbis to exercise all rights and remedies under applicable copyright law." Moreover, the language of the 2003 PPA itself, which "governs" where "there is a conflict between the . . . T&C and [the PPA]," requires that "all rights be[] licensed." Ultimately, when "read as a whole" the Agreements unambiguously "disclose [their] purpose and the parties' intent", *Ellington,* 21 N.E.2d at 1003, to limit the license to uses authorized by invoice.

Third, Defendants rely heavily on *Sohm v. Scholastic Inc.*, 2018 WL 1605214 (S.D.N.Y. 2018), urging the Court to follow that opinion's reasoning and result. *Sohm* concluded that print-run limitations governed by a similar Corbis licensing agreement were covenants, not conditions, because the agreements lacked "sufficiently unmistakable language to give rise to a condition precedent." 2018 WL 1605214, at *13. Despite quoting express language in the agreements that licenses were "conditioned upon [Defendants] meeting all conditions and restrictions imposed by Corbis" and that there was no right to distribute "[e]xcept where specially permitted on the Invoice," the *Sohm* court declared that the publisher was "better understood" to have violated a

covenant, not a condition.[10]  It explained that, in its view, the publisher's action was "a violation

of the provision prohibiting [the publisher] from 'making, using or distributing copies of any

Images for any purpose except as authorized,'" and that this provision "merely delineate[d]

acceptable and unacceptable behavior under the licensing agreement."  *Id.* (internal quotation

marks omitted).  But according to that analysis, it would be virtually impossible to limit the

scope of the license; here, as in *Sohm*, the language clearly stated that authorization to use a

photo was conditioned upon an invoice granting permission and upon receipt of payment.  Thus,

the Agreements should be read to govern exactly what they say they govern: "the specific use

described in [the] invoice."  The Agreements here expressly convey the parties' intent to do just

that—to put unauthorized use in excess of the quantities permitted by the invoices beyond the

scope of the Agreements.

     For these reasons, Defendants' overuse implicates a condition, not a covenant, and

therefore any alleged breaches sound in copyright infringement, not breach of contract.

Defendants' Motion for Partial Summary Judgment shall be denied with respect to the Corbis

Photos.

### 3.  Statutory Election Photos

     The Copyright Act allows a copyright owner to seek either "actual damages and any

additional profits of the infringer" or "statutory damages."  17 U.S.C. § 504(a).  Statutory

damages ordinarily entail "a sum of not less than $750 or more than $30,000 as the court

considers just," or, where the infringement was willful, "a sum of not more than $150,000."  *Id.*

§ 504(c).  In his motion, Plaintiff seeks statutory damages for only eight of the photos remaining

---

[10] Although Defendants describe the PPAs in *Sohm* as "identically-situated" as the PPAs here, the agreements
themselves may be distinguishable, as the *Sohm* court cites significantly less "conditional language" than is present
in the PPAs here.

14

in the case.[11]

Defendants argue not only that Plaintiff's photos are ineligible for statutory damages, but also that they cannot give rise to "any liability as a matter of law" because Plaintiff does not possess a valid copyright. In essence, Defendants contend that Plaintiff's copyright is invalid because it was Corbis, not Plaintiff, who registered the photographs as a part of a collection, and because the registration did not identify Plaintiff as the author of the photos.

As noted, Plaintiff must possess a valid copyright to succeed on his claim. In fact, the Copyright Act prohibits a plaintiff from bringing a civil action for infringement "until preregistration or registration of the copyright claim has been made in accordance with" the Act. 17 U.S.C. § 411(a). Section 409 of the Act requires that an application for a copyright registration "shall be made on a form prescribed by the Register of Copyrights and shall include . . . the name . . . of the author or authors [and] the title of the work." *Id.* § 409. The Register of Copyrights is tasked with issuing registration certificates "[w]hen, after examination, [it] determines . . . that the other legal and formal requirements of this title have been met." *Id.* § 410(a). Because the registrations on which Plaintiff relies do not include his name or the title of his individual photographs, Defendants assert that Plaintiff cannot maintain a copyright claim.

The crux of the issue, then, is whether Corbis' registration of a collection of photos under

---

[11] Those photos are found in Exhibit 1, Rows 1, 2, 4, 11, 17, 24, 38, and 39. The Court notes that although the parties seem to agree that Plaintiff elected statutory damages for the photo at Row 24, Exhibit 1, his supplemental damages disclosure does not expressly elect statutory damages for that photo.

The parties agree that with respect to fourteen of the remaining photos (those found in Exhibit 1, Rows 12, 25, and 32, and Exhibit 2, Rows 1-8 and 10-12 of the Chart) that "any overuse by [Defendants] of the photos . . . first commenced years before each of the applicable copyright registrations identified." Those photos are therefore not eligible for statutory damages. *See* 17 U.S.C. § 412 ("[N]o award of statutory damages . . . shall be made for . . . any infringement of copyright in an unpublished work commenced before the effective date of its registration."). Summary judgment is thus granted on this narrow issue. To the extent Plaintiff argues otherwise in his briefing (it is not entirely clear if he does so argue), he is unable to overcome that he has conceded that there is no issue of fact as to when the infringement began and therefore cannot show that these photos are eligible for statutory damages. Of course, because the ruling only addresses eligibility for statutory damages, these photos remain in the case.

Section 409 of the Act also effectively registered the underlying individual photos. Although the Third Circuit has suggested that registration as a "collective work is sufficient to support an action for infringement of the underlying self-contained parts," *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 206 n.2 (3d Cir. 2005), that statement is dictum, and thus the question remains open in this Circuit. Accordingly, the parties present dueling persuasive authority in support of their respective positions. Plaintiff relies primarily on *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publishing Co.*, 747 F.3d 673 (9th Cir. 2014), and *Sohm*. Defendants, for their part, point primarily to *Muench Photography, Inc. v. Houghton Mifflin Harcourt Publishing Co.*, 712 F. Supp.2d 84 (S.D.N.Y. 2010).

The key insight that Plaintiff's cases recognize is that the Act defines a "collective work" as a "work." Thus, nothing in the text requires a group registrant to list the names of each individual author or the title of each individual work; rather, the "'title of the work' refers to the collective work" and the "'author or authors' that must be listed . . . are the author or authors of the collective work[.]" *Alaska Stock*, 747 F.3d at 680-81. Corbis complied with the statute's requirements by listing its own name as the author of the collective work, and including a title for the collective. *Id.* at 681; *Sohm*, 2018 WL 1605214, at *4. Registration in this manner is as "prescribed by the Register of Copyrights and [is] consistent with Copyright Office procedure," and, moreover, has been permitted by the Copyright Office for decades. *Alaska Stock*, 747 F.3d at 675, 680.[12]

*Muench* is ultimately unhelpful to Defendants. The reasoning in that case was driven

---

[12] The Copyright Office's regulations lend further support to this reading, stating that "[r]egulation of an unpublished 'collection' extends to each copyrightable element in the collection and to the authorship, if any, involved in selecting and assembling the collection." 37 C.F.R. § 202.3(b)(4). Thus, "where . . . photographers have assigned their ownership of their copyrights in their images to the stock agency, and the stock agency registers the collection, both the collection as a whole and the individual images are registered." *Alaska Stock*, 747 F.3d at 682.

largely by a separate provision of the act, Section 103, which provides that the "copyright in a compilation or derivative work extends *only to* the material contributed by the author, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *Muench*, 712 F. Supp.2d at 94 (quoting 17 U.S.C. § 103) (emphasis added in *Muench*). Section 103, however, addresses an entirely different topic from Section 409: Section 103 covers "subject matter of copyright," whereas Section 409 covers registration of copyright. Thus, as the *Sohm* court rightly observed, while Section 103 makes clear that Corbis "did not acquire 'any exclusive right in the preexisting material,'" 2018 WL 1605215, at *4 (quoting 17 U.S.C. § 103(b))—that is, Plaintiff's photos—it says nothing as to whether the underlying registration was valid, and does nothing to undercut the reasoning set forth in *Alaska Stock*.

Defendants' motion for summary judgment with respect to the validity of the copyright registration of these eight photographs shall therefore be denied.

### B. Plaintiff's Motion for Partial Summary Judgment

After addressing Defendants' Motion, twenty-four photos remain in this case. Those photos are Rows 1, 2, 4, 11, 12, 17, 20, 24, 25, 32, 38, 39, and 48, of Exhibit 1, and Rows 1-8 and 10-12 of Exhibit 2 of the Chart. Out of those photographs, Plaintiff requests summary judgment as to the photos at Rows 1, 2, 11, and 17 of Exhibit 1, and as to all the remaining photographs in Exhibit 2, arguing that no questions of fact exist as to any of the elements of copyright infringement, *i.e.*, whether he owned a valid copyright and whether Defendants engaged in unauthorized copying of original elements of the copyrighted work. *See Tanksley*, 902 F.3d at 173. Defendants contend that various issues of fact preclude entry of summary judgment.

1. Implied License

Defendants argue that summary judgment is inappropriate because fact questions remain as to whether Corbis authorized Defendants to exceed written licenses through their course of dealing. This theory is not viable.

As already noted *supra* Section III.A.ii.a, the Third Circuit has made clear that "[t]here cannot be an implied-in-fact contract if there is an express contract that covers the same subject matter." *Baer*, 392 F.3d at 616-17; *see also Matter of Penn Cent. Transp. Co.*, 831 F.2d 1221, 1229-30 (3d Cir. 1987). The invoices issued to Defendants indicated specific authorized uses and specific quantities. Moreover, the express language of the Agreements precludes the possibility of an implied modification to their terms: "This Agreement and any listed restrictions constitute the entire agreement between the parties with respect to the subject matter hereof and merge all prior and contemporaneous communications. This Agreement shall not be modified except by a written agreement[.]" Additional language found throughout this PPAs also lends support to the conclusion that implied-in-fact modifications are not permitted, including, for example, that "[e]*xcept where specifically permitted* in the Agreement, [Defendants] may not distribute, publish, display or otherwise use [the photos] in any way," (emphasis added), that Defendants' "access to an Image does not in itself entitle [Defendants] to use that Image," and that Corbis "reserves all rights not specifically granted in this Agreement."[13]

---

[13] The Third Circuit has also suggested that extrinsic evidence like course of dealing and industry custom is particularly disfavored when attempting to displace clear cut obligations under the Copyright Act. In *Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197 (3d Cir. 2002), a defendant argued that even if it had violated the express terms of a license, its actions "were justified by industry custom and practice." *Id.* at 211. The court roundly rejected the argument, declaring that "[a] defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble." *Id.* at 211. It applied the background principle that "[e]xtrinsic evidence . . . may not be used to create an ambiguity where none exists," *id.* at 212 (quoting *Int'l Union v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999)), to conclude that "[c]ustom and practice . . . is no authority to disregard or trump the specific terms of a valid license agreement," *id.* Granted, industry custom and practice is not the same as a course of dealing between parties. Nevertheless, concerns similar to those that motivated the *Dun & Bradstreet* panel inhere to this case as well, insofar as Defendants seek to use evidence outside the express terms of the license to "trump," *id.*, the

Defendants' assertion that the PPAs show that the "parties had already agreed to a regime of various pricing levels based on the range of possible uses" is unavailing because, as discussed *supra* Section III.A.ii.a, agreeing on a price *if* you ultimately agree to a transaction is not the same as agreeing to a transaction. In that vein, Defendants' reliance on *Psihoyos v. Pearson Education, Inc.*, 855 F. Supp.2d 103 (S.D.N.Y. 2012), is misplaced. There, the court noted that, unlike most of the photos at issue here, the defendants had "failed to enter into the license agreements in the first place." *Id.* at 124. But perhaps more importantly, the *Psihoyos* court seems to suggest that implied licenses derived from course of dealing can nullify express licenses, *id.* at 127, which is contrary both to the law of New York, *Julien J. Studley, Inc. v. N.Y. News, Inc.*, 512 N.E.2d 300, 301 (N.Y. 1987); *Conte v. U.S. Alliance Fed. Credit Union*, 303 F. Supp.2d 220, 230 (D. Conn. 2004), and the law of this circuit, *Baer*, 392 F.3d at 617.

For these reasons, Defendants' argument seeking to deny summary judgment on the basis of implied licenses must fail.

### 2. Statute of Limitations

Defendants also argue that fact questions remain as to whether Plaintiff's claim is barred by the statute of limitations. This contention is correct, and as a result partial summary judgment will not be granted to Plaintiff.

No civil action for copyright infringement may be brought "unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The Third Circuit, however, recognizes that the "discovery rule" may postpone accrual of a cause of action until "the plaintiff

---

license's objective and clear intent to limit Defendants' use of the photos to those "specifically permitted by the Agreement[s]." The Southern District of New York came to exactly this conclusion in another Corbis case, *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp.3d 565 (S.D.N.Y. 2016), where that court relied on *Dun & Bradstreet* to reject "course of dealing" arguments nearly identical to those presented here, ultimately concluding that whether "Corbis may have chosen not to view defendant's pre-license use as 'infringing' is neither here nor there" because "[i]nfringement is infringement, regardless of what Corbis and [the defendant] may have chosen to call it." *Id.* at 575-76.

discovers, or with due diligence should have discovered, the injury that forms the basis of the claim." *William A. Graham Co. v. Haughey*, 568 F.3d 425, 438 (3d Cir. 2009) (internal quotation marks omitted). When the discovery rule is implicated, Defendants bear the burden of demonstrating that "storm warnings of culpable activity" existed; if Defendants do show such "storm warnings," the burden then shifts to Plaintiff "to show that [he] exercised reasonable due diligence and yet was unable to discover [his] injuries." *Id*. In applying the discovery rule, the first step is to establish when the injury actually occurred. *Id*. Then, a court must determine if the injury was immediately discoverable or if the accrual date is postponed. *Id*.

"Storm warnings 'may take numerous forms,' such as 'any financial, legal or other data that would alert a reasonable person" to the probability that infringement had occurred. *In re Merck & Co., Inc, Secs, Derivative & "ERISA" Litig.*, 543 F.3d 150, 162 (3d Cir. 2008); *see also Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001) (noting that a "mix of information may constitute a storm warning in the aggregate") (internal quotation marks omitted). Whether "storm warnings" existed is an objective inquiry. *In re Merck & Co.*, 543 F.3d at 162. Defendants point to evidence suggesting: Plaintiff was aware of overruns in the industry for ten to fifteen years before he brought suit; Plaintiff knew that numerous photographers were suing textbook publishing companies for copyright infringement; Plaintiff learned some of this information from industry or trade publications. *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (noting that the objective inquiry "hinges not on a plaintiff's actual awareness of suspicious circumstances" and thus "saddles [Plaintiff] with responsibilities like reading prospectuses, reports, and other information related to the investments . . . and, additionally, assumes knowledge of publicly available news articles") (internal quotation marks omitted). Defendants have adduced sufficient evidence to show the

presence of storm warnings.

Given that Defendants have demonstrated storm warnings, "the burden shifts to [Plaintiff] to show that [he] exercised reasonable due diligence and yet was unable to discover its injuries." *Id*. Rather than set about showing that it has met its burden, Plaintiff takes the position that the burden has not shifted because the storm warnings in this case came before his injury occurred. He cites, however, to no authority that treats the burden shifting framework differently when storm warnings came before, rather than after, the alleged copyright infringement. The Third Circuit makes no such distinction, requiring simply that once a defendant demonstrates storm warnings, "the burden shifts to [the plaintiff] to show that it exercised reasonable due diligence and yet was unable to discover its injuries." *Id.* Thus, a fact issue remains as to whether Plaintiff had notice of his injury, and if so, whether he exercised reasonable diligence upon such notice.[14]

## IV.   Conclusion

For ease of reference: The remaining photos in this action are found on the Chart at Rows 1, 2, 4, 11, 12, 17, 20, 24, 25, 32, 38, 39, and 48, of Exhibit 1 and 1-8 and 10-12 of Exhibit 2 because Defendants' motion is granted with respect to Rows 3, 5, 6, 7, 8, 9, 10, 13, 14, 15, 16, 18, 19, 21, 22, 23, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 52, 53, 54, 55, 56, and 57 of Exhibit 1 to the First Amended Complaint and Row 9 of Exhibit 2 to the First Amended Complaint.

Defendants' motion to find that Plaintiff cannot elect statutory damages with respect to Row 12 of Exhibit 1 to the First Amended Complaint and Rows 1-8 and 10-12 of Exhibit 2 of

---

[14] Plaintiff's remaining request, that the Court find willful infringement as a matter of law, is also denied. Willfulness is necessarily a fact intensive question that delves into Defendants' intent. As expected, a fact issue exists here, as Defendants claim that they did not believe they needed to obtain another invoice. Thus, summary judgment as to willfulness shall be denied.

the First Amended Complaint is denied.  Plaintiff's motion is denied in its entirety.

      An appropriate order follows.

**BY THE COURT:**


**/s/Wendy Beetlestone, J.**

_____
**Date: October 22, 2018**          **WENDY BEETLESTONE, J.**